**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MICHAEL D. SHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-00575** |
| | ) | **Judge Trauger/Knowles** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) to obtain judicial

review of the final decision of the Commissioner of Social Security denying Plaintiff Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the

Social Security Act ("the Act"), as amended.  The case is currently pending on Plaintiff's Motion

for Judgment Upon the Administrative Record.  Docket No. 12.  Plaintiff's Motion was

accompanied by a supporting Memorandum of Law.  Docket No. 13.  Defendant has filed a

Response, arguing that the decision of the Commissioner was supported by substantial evidence

and should be affirmed.  Docket No. 14.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment Upon the Administrative Record by DENIED, and that the decision of the

Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff protectively filed his applications for DIB and SSI on August 10, 2010, alleging

that he had been disabled since April 20, 2008, due to severe panic disorder, post traumatic stress disorder, anxiety, agoraphobia, mitral valve prolapse, digestive problems, constant dizziness, excessive vomiting, possible bipolar, and "mental health." Docket No. 10, Attachment ("TR"), TR 255-58, 259-60, 306, 310.[1] Plaintiff's applications were denied both initially (TR 105, 106) and upon reconsideration (TR 107, 108). Plaintiff subsequently requested (TR 152-53) and received (TR 71-14) a hearing. Plaintiff's hearing was conducted on December 14, 2011, by Administrative Law Judge ("ALJ") Elizabeth P. Neuhoff. TR 71-104. Plaintiff and vocational expert ("VE"), Michelle McBroom-Weiss, appeared and testified. TR 71.

On December 22, 2011, ALJ Neuhoff issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 109-128. Plaintiff appealed the ALJ's decision to the Appeals Council. TR 198-99. As part of his appeal, Plaintiff submitted a letter from one of his treating sources, Amy Rewa, M.S., N.C.C. TR 1154-56. In that letter, Ms. Rewa wrote that the ALJ's December 22, 2011, decision interpreted her statements in a manner inconsistent with her intentions. *Id.* She attempted to clarify her prior statements, and further opined that she did not think Plaintiff would be capable of holding a job at that time. *Id.* The Appeals Council vacated the ALJ's decision and remanded the case to the ALJ. TR 129-33.

Upon remand, Plaintiff received a second hearing. TR 46-70. Plaintiff's second hearing was conducted on October 22, 2013, again by ALJ Neuhoff. TR 46. Plaintiff and VE Melissa Neel appeared and testified. *Id.* On January 3, 2014, ALJ Neuhoff issued a second decision

---

[1] Although Plaintiff's applications reflect actual filing dates of August 17, 2010 for SSI (TR 255) and August 11, 2010 for DIB (TR 259), the ALJ recounted Plaintiff's protective filing date of August 10, 2010 in her decision. *See* TR 21.

unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 18-38.  Specifically, the ALJ made the following findings of fact:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.      The claimant has not engaged in substantial gainful activity since April 20, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: post-traumatic stress disorder [(]"PTSD"), panic disorder without agoraphobia, somatoform disorder, and substance abuse (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is restricted to unskilled work consisting of both simple and complex tasks and instructions, but he cannot perform executive level tasks or instructions; he can attend to and complete such tasks and instructions for periods of at least two hours at one time; he cannot work around the general public; he can handle work-only related contact with co-workers and supervisors; he can respond appropriately to hazards; and he can adapt to gradual changes in routine.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 5, 1980 and was 27 years old, which is defined as a younger individual age 18-49, on

3

the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

TR 24-38.

On February 18, 2014, Plaintiff timely filed a request for review of the hearing decision. TR 15-17. On March 24, 2015, the Appeals Council issued a letter declining to review the case (TR 1-6), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of record. Accordingly, the Court will discuss those matters only to the

extent necessary to analyze the parties' arguments.

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine: (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996), *citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389, *citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985),

*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnoses and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze,* 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings at the Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process summarized as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the

6

"listed" impairments or its equivalent.[2]  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

(5) The burden then shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*See, e.g.,* 20 CFR §§ 404.1520, 416.920.  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the Medical-Vocational Guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  *Moon*, 923 F.2d at 1181; 20 CFR § 404, Subpt. P, App. 2, Rule 200.00(e)(1), (2).  *See also Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 281-82 (6th Cir. 1985).  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is

---

[2] The Listing of Impairments is found at 20 CFR § 404, Subpt. P, App. 1.

typically obtained through vocational expert testimony.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments: mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement of Errors

Plaintiff contends that the ALJ: (1) failed to comply with the instructions of the Appeals Council by not properly evaluating the medical opinion evidence of his treating sources, Patricia Shawberry, M.D. and Amy Rewa, M.S., N.C.C., and nontreating psychological examiners Marie La Vasque, M.S., M.A. and Susan Vaught, Ph.D., as required by the Social Security Regulations and Sixth Circuit case law, as well as erroneously asserting that there have been gaps in Plaintiff's treatment history; (2) improperly found that Plaintiff's alleged limitations were not fully credible, relying on Plaintiff's physical activity even though he alleges only mental impairments; and (3) posed a hypothetical question to the VE that did not adequately describe Plaintiff's functional limitations and that contained a vague term.  Docket No. 13, p. 11-17. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded.  *Id.* at 18.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1.  Compliance with Instructions of the Appeals Council and Evaluation of the Medical Opinion Evidence

Plaintiff argues that the ALJ did not comply with the express instructions of the Appeals Council directing the ALJ to "sufficient[ly]" evaluate Plaintiff's treating source notes. Docket No. 13, p. 11. Specifically, Plaintiff contends that the ALJ noted that the treatment notes from Plaintiff's mental health provider were "largely based on his subjective complaints," but maintains that this would necessarily be the case because no objective medical tests have been developed for the type of mental impairments alleged by Plaintiff. *Id.* Plaintiff asserts that "[t]he ALJ does not give any further evaluation of the treating source notes as is clearly required by the remand order." *Id.* Plaintiff additionally argues that the ALJ erroneously stated that there have been gaps in Plaintiff's therapy treatment, when instead Plaintiff's treatment has been "very consistent" since becoming a patient at Volunteer Behavior Health (Cumberland Mental Health) in 2010. *Id.*

Plaintiff further contends that the ALJ neither properly considered, nor gave good reasons for rejecting the Medical Source Statement ("MSS") opinion of his treating sources, Dr. Shawberry and Ms. Rewa. *Id.* at 12-14. Specifically, Plaintiff maintains that "the ALJ again gives only the briefest, most cursory explanation for discounting the treating source opinion, and does not cite any specific information in the record which contradicts or fails to support this opinion except to assert that the treating source must be overly sympathetic to the Plaintiff," such that the ALJ's decision fails to comply with the Appeals Council's directive, the Sixth Circuit case law, or the Regulations. *Id.* at 14.

Regarding the opinion of non-treating consulting psychological examiners Dr. Vaught and Ms. La Vasque, Plaintiff argues that the ALJ "change[d] her tune," as she assigned that opinion "'significant' weight" in her first decision, but in her second decision assigned it "'some weight'" and also stated that she "'does not afford it more than significant weight.'" *Id.* at 15, *citing* TR 42, 127. Plaintiff contends that "[n]o explanation is given for the difference; there are no changes in the consultant's [*sic*] report or other information that would explain why suddenly a different weight is appropriate[;] [n]or is there any actual explanation of why the varying weights have been assigned." *Id.* Plaintiff further maintains that the ALJ failed to discuss the consistencies between this opinion and that of Plaintiff's treating source. *Id.*

As will be discussed in greater detail in a subsequent statement of error, Plaintiff additionally argues that Dr. Vaught and Ms. La Vasque's opinion contains significantly greater limitations than did the ALJ's hypothetical question to the VE. *Id.*

Defendant responds that the ALJ "properly weighed the medical opinions in the record." Docket No. 14, p. 9. Defendant does not address Plaintiff's contention that treatment notes from

his provider are based on his subjective complaints because no objective medical tests exist for the type of impairments Plaintiff alleges, but asserts that "[t]he ALJ's consideration of the subjective aspects of Plaintiff's complaints comported with the regulations at C.F.R. §§ 404.1529, 416.929 (2015)." *Id.* at 5. Defendant further responds that Plaintiff did indeed have gaps in his treatment history, as the ALJ found, and thus, Plaintiff's treatment history does not support his subjective allegations. *Id.* at 7. Defendant states:

> However, Plaintiff had gaps in his treatment. Plaintiff alleged disability beginning in April 2008, but did not seek treatment until June 2008. He then sought no treatment until October 2009. He did not get treatment again until June 2010. Plaintiff also had several appointments that he cancelled or did not attend. Plaintiff did not always comply with his medication and refused additional medication.

*Id.* (citations omitted).

Defendant further maintains that the ALJ "properly considered the opinions and incorporated the credible limitations into the RFC finding" and notes that "[i]t is the function of the ALJ to resolve the conflicts between the medical opinions." Docket No. 14, p. 9-10. Defendant argues that "the ALJ properly considered Dr. Vaught's and Ms. La Vasque's opinion and gave it some weight" and "also gave some weight to the opinions of the state agency medical consultants." *Id.* at 10-11 (citations omitted). Defendant argues that Dr. Shawberry had only seen Plaintiff only twice when completing the evaluation form and never renewed the opinion, and asserts that "Ms. Rewa admitted that she relied on Plaintiff's subjective allegations. *Id.* at 11-12. Defendant further argues that the ALJ properly found that the opinion of Dr. Shawberry and Ms. Rewa was inconsistent with Plaintiff's daily activities and treatment history, such that the ALJ properly found that the opinion was entitled to only little weight. *Id.* at 12-13.

Referring to the letter written by Ms. Rewa in response to the ALJ's first decision, Defendant contends that the ALJ "also properly rejected Ms. Rewa's subsequent opinion." *Id.* at 12, *citing* TR 35-36, 1156. Defendant asserts that "the ALJ has broad discretion when evaluating Ms. Rewa's opinion" and "the ALJ found Ms. Rewa's statements regarding Plaintiff's improvement and daily activities inconsistent with the record." *Id.* (citations omitted). Defendant also contends that "an opinion that Plaintiff cannot hold a job is an opinion on matters that are reserved to the Commissioner . . . ." *Id.*

Upon remand, the Appeals Council directed the ALJ to take the following actions:

> Obtain additional evidence, and consider the new and material evidence submitted with the claimant's request for review, concerning the claimant's mental impairments in order to complete the administrative record in accordance with the regulatory standards.

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p and nonexamining source opinions in accordance with the provisions of 20 CFR 404.1527(e) and 416.927(e) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CFR 404.1512 and 416.912).

> If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.

The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

In compliance with the above, the Administrative Law Judge will offer the claimant an opportunity for a hearing, address the evidence which was submitted with the request for review, take any further action needed to complete the administrative record and issue a new decision.

TR 131-32.

As will be discussed in further detail below, acting on the directions of the Appeals Council, the ALJ considered the new evidence that had arisen during the period of time since Plaintiff's first hearing on December 22, 2011, including *inter alia*, a new opinion letter submitted by Ms. Rewa. *See* TR 24-25, 27, 30, 31, 35-36. The ALJ then held a second hearing and obtained supplemental evidence from the VE by asking an updated hypothetical question. TR 37-38, 46-70. Ultimately, after reviewing the new evidence and holding a second hearing, the ALJ again found that Plaintiff was not disabled. TR 18-38.

Plaintiff filed a request for review of the second hearing decision with the Appeals Council (TR 15-17), and, after reviewing Plaintiff's request and accompanying rationale, the Appeals Council stated that "[w]e found no reason under our rules to review the Administrative Law Judge's decision dated January 3, 2014" (TR 1). The Appeals Council further explained:

We applied the laws, regulations and rulings in effect as of the date we took this action. Under our rules, we will review your case for

any of the following reasons:

- The Administrative Law Judge appears to have abused his or her discretion.
- There is an error of law.
- The decision is not supported by substantial evidence.
- There is a broad policy or procedural issue that may affect the public interest.
- We receive new and material evidence and the decision is contrary to the weight of all the evidence now in the record.

*Id.* After reviewing Plaintiff's file and the ALJ's decision, the Appeals Council applied its rules and declined to further remand the case to the ALJ.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in

determining the weight to give the opinion. . . .

        (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion . . . .

        (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

        (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

        . . .

20 CFR § 416.927(c) (emphasis added).  *See also* 20 CFR § 404.1527(c).

    The ALJ must articulate the reasons underlying her decision to give a medical opinion a specific amount of weight.[3]  *See, e.g.,* 20 CFR § 404.1527(d); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

    The Sixth Circuit has held that, "[p]rovided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r of*

---

[3] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 CFR § 1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006).

*Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002), *quoting Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). If the ALJ rejects the opinion of a treating source, however, the ALJ is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

The ALJ in the instant action extensively discussed Plaintiff's mental health treatment and medical opinion evidence as follows:

> . . . [O]n June 24, 2010, the claimant had an Intensive Intervention Center admission at the Mental Health Cooperative ("MHC"). He had reported a plan to shoot himself and a history of one previous suicidal gesture. He reported that he had a long history of anxiety. However, his suicidal ideation was actually set off by cutody issues surrounding his son. He denied homicidal ideation and hallucinations. He did complain of panic attacks, dizziness, and vomiting. He had been taking Klonopin since 1999, but he had tapered his medications on his own, because he did not think they were working, and also because he said he did not want to become addicted. However, he also admitted to weekly marijuana use (Ex. 3F at 7-16). He was released on June 26, 2010 (Ex. 3F at 33).
>
> Following his discharge, he came in for a visit on June 28, 2010. He was appropriately dressed and had good hygiene. He has stopped taking Klonopin (Ex. 3F at 35). He returned the following day for his first clinic visit. He was initially given a diagnosis of bipolar disorder and started on Tegretol and Zyprexa Zydis. He reported chest pain when anxious. He said he was having crazy dreams since starting his new medications. He claimed to have two to three panic attacks a day. But, he denied depression, mood swings, or irritability, and he said he was a "laid back guy." Staff continued the Tegretol and increased his Zypresxa dose (Ex. 3F at 37). He came back on July 2, 2010. Despite medication compliance, he said the medications were not working. He claimed he was very anxious, sweating, and having panic attacks.

Staff increased the Tegretol and added Vistaril (Ex. 3F at 40). That same day, he was seen in the emergency room of Centennial Medical Center complaining of anxiety attacks off Klonopin. Dr. Terry Wayne Cain, M.D., felt the claimant was having a medication reaction to Tegretol and Zyprexa, so he switched the claimant to Fluoxetine and Trazodone (Ex. 5F at 2-3). It also appears he visited Nashville General Hospital with similar complaints (Ex. 31F at 1-20).

On July 13, 2010, the claimant presented at Vanderbilt University Medical Center for an initial evaluation for mental health services. He reported symptoms of panic including a sensation of death, sweating, hot flashes, chest pain, dizziness, and vomiting. He said these had a random occurrence in crowds and with friends and family. He reported that Klonopin had been his most helpful medication in the past. He reported no psychosis or mood instability symptoms. He had no mania or hypomania. He denied flashbacks and reported only rare nightmares. He said he avoided people. He reported using marijuana twice a week. He indicated that he was apparently two courses away from a bachelor's degree. He had wanted to be a botanist at some point. He admitted that he owned his own business and he had shared custody of his son. He denied suicidal ideation. Staff diagnosed him with PTSD and panic disorder without agoraphobia. They gave a global assessment of functioning score of 60, suggestive of moderate symptoms or limitations.

The claimant presented for his first therapy visit at Vanderbilt University Medical Center on July 21, 2010. His affect was normal but he did have motor agitation and shifted about. Staff still gave a global assessment of functioning score of 60 (Ex. 4F at 22-23). On August 9, 2010, he presented after he requested an appointment due to increased anxiety. It had occurred without a trigger. He was less anxious by the end of his therapy session. He did not have suicidal ideation. Staff still gave a global assessment of functioning score of 60 (Ex. 4F at 14-16). He returned on August 11, 2010, saying that he had experienced long panic attacks the day before. He was unaware of any trigger. However, he was using medication and other techniques to calm himself. His global assessment of functioning score remained 60, and it would remain 60 through his last documented visit on August 25, 2010 (Ex. 4F at 2-11). . . .

. . .

On October 5, 2010, the claimant presented at Volunteer Behavioral Health Care System ("VBHCS") for mental health services. He was reportedly in reasonably good physical health. His primary care provider was prescribing his psychiatric medication; the claimant said these were minimally effective. He had ended his therapy at Vanderbilt due to financial issues. He claimed he was experiencing two to three panic attacks (or more) on a daily basis. He claimed to have stopped using marijuana regularly seven years earlier. He said marijuana increased his anxiety. Staff noted he had a great many skills or activities, including advanced karate, running almost every day and involvement in a world religion discussion group. He said he last worked in June 2010. Staff gave a low global assessment of functioning score of 38 (Ex. 22F at 2-9).

He had his first therapy appointment at VBHCS on October 22, 2010. He complained of multiple panic attacks every day. He had only been approved for a limited number of therapy visits (Ex. 22F at 43-45). His next visit was on October 29, 2010. He reported recently visiting with family members and starting back at work. He reported continued panic attacks but he also said these were mostly non-debilitating (Ex. 22F at 46). On November 5, 2010, he reported the best week he had experienced in two to three years. He had been working. He said, "it was tough but I did it." He reported less frequent panic attacks, too (Ex. 22F at 48). He reported an increase in symptoms on November 19, 2010, but he was back to his "normal" level of symptoms by December 2010. He also revealed that he was doing a world religion group on Saturdays (Ex. 22F at 60).

On November 18, 2010, the claimant underwent psychological examination by senior psychological examiner Marie La Vasque and Dr. Susan Vaught, Ph.D., at the request of the State agency. The claimant reported that he had smoked marijuana since he was 11 years old. He reported, "I really love high-grade pot . . . (but) I feel my heart race when I smoke pot." He was no longer in therapy. He reported being enrolled at Middle Tennessee State University with decent grades. He was also self-employed cutting grass, painting, cleaning pools, and doing demolition work. His activities of daily living were surprisingly unrestricted. He said he lived on his own and was a really good cook. He said he cooked things taking up to 40 minutes to complete. He said he cleaned his home regularly and independently. He reported bathing and

18

dressing himself daily. He drove himself to the examination. His mood was visibly depressed and anxious, and he demonstrated excessive preoccupation with medication conditions. He denied suicidal ideation. In the structured setting of the interview, his attention and concentration were only mildly impaired. Ms. La Vasque and Dr. Vaught diagnosed him with alcohol abuse or dependence, cannabis abuse, an undifferentiated somatoform disorder, generalized anxiety disorder, panic disorder without agoraphobia, and PTSD (Ex. 10F).

. . .

. . . On March 9, 2011, the claimant spoke with staff at VBHCS, noting that he had lost his insurance coverage. He was hoping to get back into therapy soon. Still, he reported increased physical activity and decreased panic attacks. A new doctor had increased his Klonopin dosage (Ex. 22F at 60; *see also* Ex. 24F at 2). . . .

Ultimately, it was not until June 28, 2011, when he was able to return to VBHCS. He reported some suicidal and homicidal ideation in the recent past, but he was not having these symptoms currently. He reported multiple daily panic attacks as well (Ex. 22F at 61). He resumed individual therapy by July 5, 2011. Over the next few months, his therapy records show mixed progress. He continued to complain of his common symptoms, including frequent panic attacks, and reported several periods of increased symptoms. His therapist repeatedly noted that he was making progress using relaxation methods, assertiveness, and other modalities, and generally documented signs of improvement despite the claimant's complaints (Ex. 22F at 12-41).

In October and November 2011, records from VBHCS show that recent changes to the claimant's medications resulted in improvement in his sleep and less physical anxiety symptoms through November 19, 2011 (Ex. 28F at 1-16). It appears he had some homicidal ideation without intent and some continued depression as of November 21, 2011, but he admitted that he was without suicidal ideation, he was sleeping better, and had fewer panic attacks. He did claim the panic attacks he had were more severe, however. The homicidal ideation resolved by November 29, 2011, with abated anger symptoms. He did claim to have some gastrointestinal side effects from Seroquel and he stopped taking it (Ex. 28F at 15-19). However, he was back on it with better sleep

in early December 2011. He had some more homicidal ideation without intent and some thoughts about death (but not suicidal ideation) at that time (Ex. 28F at 21-22). The homicidal ideation resolved by December 19, 2011, but he still had some thoughts of death (Ex. 28F at 24-25). During visits in late December and early January, he reported issues with his brother and some passive homicidal ideation, but no suicidal ideation (Ex. 28F at 27-31). He reported mild visual hallucinations but more success controlling his homicidal ideation on January 9, 2012, and he was doing better with boundaries regarding his brother as of January 16, 2012 (Ex. 28F at 33-37).

On January 24, 2012, he told VBHCS about a recent emergency room visit for physical symptoms of his panic disorder that were different than he had previously experienced. He apparently had some passive homicidal ideation without intent and no suicidal ideation (Ex. 28F at 39-40). In early February 2012, two major stressors included problems with his family and fighting off an attempted robbery. He still had some homicidal ideation without intent (Ex. 28F at 42-43). On February 14, 2012, he reported an increase in panic symptoms over the past week, but a friend had recently died. He had no significant homicidal ideation, no suicidal ideation, and staff made no mention of hallucinations (Ex. 28F at 45-46).

On February 21, 2012, the claimant told VBHCS staff that he was doing better than he had in a long time (Ex. 28F at 48-49). Later that month, he reported increased anxiety, and in early March 2012, he noted a change in the nature of his anxiety, although some symptoms had increased and some decreased (Ex. 28F at 51-55). On March 13, 2012, he revealed that he had the same overall level of anxiety; just the nature of his individual symptoms had changed (Ex. 28F at 57-58). He reported continued anxiety through the rest of March 2012, some of this was due to him caring for his eight-year-old son. He identified seeing men in military uniforms as an anxiety trigger around this time (Ex. 28F at 60-64). He was a little more relaxed at the start of April 2012, as a child support hearing went well and the threat of incarceration was removed. He had an "aha" moment when considering the connection between his anxiety and years of alcohol and drug use. He had apparently quit using substances at this time and he was proud he had done so (Ex. 28F at 66-67).

In mid-April, VBHCS staff noted no current suicidal or homicidal ideation. Considering his pasts violent thought patterns, staff felt some were probably still present (Ex. 32F at 2-3, 5-6). By the end of April, staff noted a decline in violent thoughts and impulses (Ex. 32F at 8-9). On May 1, 2012, he reported continued anxiety and some return of violent thoughts without a plan to act on them. He was without hallucinations or suicidal ideation (Ex. 32F at 11-12). But the violent thoughts resolved again by May 10, 2012 (Ex. 32F at 14-15).

On May 14, 2012, VBHCS staff noted he was more open, somewhat more hopeful, and feeling better despite continued anxiety symptoms. He had recently left a film due to his anxiety, as an example of his retained symptoms. He was without hallucinations, suicidal ideation, or homicidal ideation (Ex. 32F at 17-18). He reported increased panic attacks on May 22, 2012, but no further significant changes through the rest of May 2012. He remained without hallucinations, suicidal ideation, and homicidal ideation (Ex. 32F at 20-24). He reported a recent panic attack on June 5, 2012, but he was without violent thoughts and indicated he still had "some" fight left in him with respect to battling his mental illness (Ex. 32F at 26-27). His violent behavior returned the next day, when he came to suspect that his fiancé was cheating. It turned out that she was not, but he apparently assaulted three people. He quickly came to realize his behavior was excessive. Within a few days, he was somewhat better and less dramatic, according to VBHCS staff (Ex. 32F at 35-36).

He likely had a panic attack just prior to his VBHCS visit on June 26, 2012, but he noted that he was managing to leave home more with people he trusted, showing some progress in his social activities and community excursions. He remained without hallucinations, suicidal ideation, and homicidal ideation (Ex. 32F at 38-39). He reported an increase in panic symptoms in early July 2012, although he apparently had no depression (Ex. 32F at 41-44). However, on July 17, 2012, after claiming he had especially bad anxiety that week, he admitted that he usually said something to this effect to VBHCS staff. This tends to call into question the accuracy of his statements to VBHCS staff during office visits, as it suggests he may have over-dramatized his actual symptoms. Regardless, he also mentioned that his fiancé had made some small progress in helping him to be less "serious" and display less "drama" in his behavior. He also remained without hallucinations,

suicidal ideation, and homicidal ideation (Ex. 32F at 46-47).

On August 7, 2012, the claimant complained of a particularly severe panic attack and a return of rage and anger symptoms. However, he had been able to cope successfully with his anger. He remained without suicidal or homicidal ideation despite the increase in anxiety and anger (Ex. 32F at 52-53). He mostly discussed his non-severe gastrointestinal issues on August 14, 2012, but remained without suicidal or homicidal ideation (Ex. 32F at 55-56). The claimant developed concern about his elderly dog's health in late August 2012. He had also changed his plans for bible study and had some difficulty trying to pick up his son after school, although conversely he had made some progress with tasks at home despite anger when frustrated. He had also enrolled himself in online college courses (Ex. 32F at 61-62).

On September 4, 2012, the claimant reported stress regarding the online coursework, but he was not violent with only some impulsivity and verbal anger. He remained without hallucinations or other particularly serious mental health symptoms (Ex. 32F at 64-65). On September 11, 2012, he again noted the classes were stressful, but he also indicated he was doing well (Ex. 32F at 67-68). He reported a return of violent thoughts on September 17, 2012, but he had no associated intent, and on September 25, 2012, he was more positive and energetic than his past two visits, according to VBHCS staff (Ex. 32F at 70-74). On October 10, 2012, the claimant noted some continued violent thoughts but also that he was working on correcting his bad decisions (Ex. 32F at 79-80).

On October 22, 2012, the claimant noted that his schoolwork was going a bit better. He was benefitting from his use of audio versions of his books. He reported some recent homicidal ideation without any intent (Ex. 23F at 82-83). On October 29, 2012, he noted that he got two A's and two F's for grades in his courses. It is not clear if these were final grades. He was meditating daily (Ex. 32F at 84-85). It appears staff then had trouble reaching the claimant for several weeks (Ex. 32F at 86-87). He said he had dropped one class on November 20, 2012. He reported some violent thoughts without homicidal ideation (Ex. 36F at 11-12). On December 10, 2012, VBHCS staff noted better coping habits. He felt he was not cut out for school, but he was having conflict with one of his teachers (Ex. 36F at 13-14). December 2012 was

apparently a stressful time for the claimant, but this is understandable despite his conditions, as his brother apparently held him hostage for a short period (Ex. 36F at 15-16). He claimed he was having panic attacks daily as of January 3, 2012, and had some suicidal ideation one night without intent (Ex. 36F at 18-19). He had similar complaints on January 10, 2013, but VBHCS staff noted some forward movement (Ex. 36F at 21-22).

On January 17, 2013, he reported intense panic attacks, but as noted previously, he had sometimes been overly dramatic in the past. He had changed one of his classes because both he and his therapist felt the textbook on abnormal childhood development was probably a poor choice considering his history (Ex. 36F at 24-25). He reported continued anxiety in the start of early February 2013. He noted that he had visited Gatlinburg, Tennessee, but that the trip went miserably. He claimed to have "out of body" and "detached" feelings that were new, but staff made no observations suggesting of such a change, for example his affect was normal for him in their experience (Ex. 36F at 27-28). He reported a return of homicidal ideation in early March 2013, without any intent or specific target. It appears to have been mostly fantasizing about protecting his family members from harm, rather than a reflection of anger (Ex. 36F at 4-5).

On March 12, 2013, the claimant noted that he was trying to catch up at school. He was also spending time with his son, who was on spring break. He was using "self-talk" techniques that sometimes helped to shorten or ease his panic attacks (Ex. 36F at 7-8). By late March 2013, his anger issues were abating again. He also admitted that he had experienced fewer panic attacks over the past two years in therapy (Ex. 36F at 10-11). The claimant told VBHCS staff that he did not like going places or being around people on April 11, 2013, but he acknowledged the role doing so had in bolstering his self-esteem. He had quit one online course but expected to receive an A in another (Ex. 26F at 13-14).

No significant change in his condition occurred during the rest of April 2013. He did mention to VBHCS staff that he had not used marijuana since December 2012 (Ex. 37F at 16-21). On May 7, 2013, he mentioned some additional stress helping his grandparents in some largely unspecified manner. He felt therapy was less enjoyable lately, but he was happy with some of the changes he had been making in his life (Ex. 37F at 22-23). On

May 21, 2013, he advised staff that his dog had died. His fiancé had apparently always wanted a dog of her own, so they quickly adopted another dog (Ex. 37F at 25-26).

On June 11, 2013, VBHCS staff noted the claimant was actually calm, although he was not precisely relaxed, according to their observations. There had recently been a fire in their home. He had displayed some aggressive behavior to vent stress, but it was not directed towards people, and he had no violent or homicidal ideation (Ex. 37F at 28-29). He reported some aggressive driving behavior in late June 2013, and he had been banned from his church for swearing at a nine-year-old. He did not have homicidal ideation and he remained free of psychosis or suicidal ideation (Ex. 37F at 31-32). He noted stress driving and attending films on July 11, 2013, but he remained without concerning ideation or psychosis (Ex. 37F at 34-35). On July 18, 2013, the claimant noted he had been doing some productive tasks in repairing his home after the fire (Ex. 37F at 37-38). While his testimony indicated he does remain in treatment at VBHCS, further treatment records were not available at the time of this decision. It does appear the claimant voiced a complaint about one of his providers later in 2013, but specific details were not provided by VBHCS (Ex. 41F).

. . .

Amy Rewa, a counselor at VBHCS, and Dr. Patricia Shawberry, M.D., gave their opinion of the claimant's mental functioning on October 17, 2011 (Ex. 23F). Their assessment, in particular their suggestion of "extreme" limitation in interactions with the public and responding to usual work situations and changes in routine work settings, was overly restrictive in light of the claimant's documented activities. While he is clearly limited in these areas, his activities show that he does not have a total inability to function in these areas, and is less limited in other areas as well. Thus, little weight is ascribed to this opinion.

The Appeals Council specifically noted an opinion submitted by Ms. Rewa after the original hearing in their order. In her December 6, 2012 letter, Ms. Rewa, [sic] asserted that the original decision's interpretation of her statements was not consistent with her intentions. She claimed that the documentation pertaining to the claimant's daily activities were those he would do if he felt able, not that he was not [sic] in fact practicing Karate or running.

24

Furthermore, Ms. Rewa felt the claimant's report of symptoms, any improvement on a single day was not objective, but greatly influenced by his mood at the time of reporting, and the effects of cognitive, and memory decline limit his ability to increase functioning. Ms. Rewa felt there were as many reports of symptom regression as there were showing improvement in her records. She felt that the claimant would not be able to hold a job, specifically noting his anxiety and mood lability would limit his interpersonal function such that he was unlikely to success [*sic*] in any work environment (Ex.33F); *see also* Appeals Council order Ex. 6A). *The undersigned considered Ms. Rewa's opinion and objections in reaching this decision. However, the claimant has been seen at VBHCS for many years. Ms. Rewa as not the only provider to treat the claimant. Neither she nor any other provider regularly suggested his reports of activities were merely aspirational in a context other than in support of his disability claim. His activities subsequent to her letter continued to show activities inconsistent with what she suggests, including that he attempted to travel out of town, he continued to attend online courses, he continued to help care for his son, and he acknowledged how going out in public helped his self-esteem. Her statements about his ability to be around others are inconsistent with these activities. The undersigned notes that he managed to have healthy relationships with his son and fiancé and tend [sic] to suggest his social functioning is not so severe as to prevent safe interaction with others. While the undersigned agrees that some social and emotional issues are present that would preclude work with the public, the undersigned concludes that a total preclusion of all social interaction would be unsupported by his activities. In* addition, the undersigned notes that the opinion that the claimant would not be able to hold a job is outside of the area of expertise of this provider and is an area solely within the province of the Commissioner. Furthermore, it is only natural to expect that this source would attempt to assist the claimant in his pursuit of disability and thus the opinion given may have been inadvertently skewed towards that end.

Instead, the undersigned affords some weight to the opinion of Ms. La Vasque and Dr. Vaught. *Although they are not treating sources, they conducted a detailed examination of the claimant, and their opinion is far more consistent with the claimant's documented activities than the opinion of from [sic] VBHCS* (Ex. 10F). It forms the basis of the above residual functional capacity.

The undersigned also affords some weight to the State agency psychological consultants' mental assessments (Ex. 17F). The Appeals Council suggested that some of the observations in the report were opinion evidence that the undersigned failed to note in the previous decision in affording weight to this opinion. Specifically, they assert that the residual functional did not include consideration of Dr. Vaught and Ms. La Vasque's opinions that the claimant's thought processes were disorganized, and he will have to be redirected often, or that his difficulty engaging in a reciprocal conversation would negatively impact his ability to appropriately relate to and work with coworkers and supervisors. And that the decision did not include a rationale for not including the limitations included in Dr. Vaught and Ms. La Vasque's medical assessment (Ex. 6A). *First, the undersigned notes that these clinical observations of the claimant were mostly subjective in nature, and there was sufficient discussion of his substance abuse that this may be representative of that use rather than his specific mental health symptoms. Second, the undersigned notes that the opinion merely suggests the presence of difficulty in these areas, without specifying how much limitation is present. Considering the claimant's activities, which including social, academic, and household activities well detailed above that are far excess [sic] of a total preclusion of any meaningful function in these areas, the undersigned concludes that some useful function remains. This is why the undersigned does not afford more than significant weight to the opinion. Ultimately, the residual functional capacity accounts for the possibility of limitation in these areas, tempered by what his activities and treatment records show about his retained functional capacity.*

TR 28-34, 35-36, *citing* TR 129-33, 458-500, 501-39, 540-80, 609-14, 681-84, 726-800, 801-04, 853-926, 1006-51, 1052-1153, 1154-56, 1188-1216, 1217-77, 1366 (emphasis added).

As can be seen, contrary to Plaintiff's assertion, the ALJ followed the instructions of the Appeals Council; she comprehensively discussed Plaintiff's mental health treatment records, and considered the opinion of Dr. Shawberry and Ms. Rewa (including her recently submitted letter), as well as that of Ms. La Vasque and Dr. Vaught. *Id.* In comprehensively discussing Plaintiff's mental health treatment records, the ALJ demonstrated that she was aware of the longitudinal

history, frequency, and consistency of Plaintiff's treatment, as well as the reasons Plaintiff stopped or started treatment. There is simply nothing in the record to indicate that the ALJ's statement that there had been gaps in Plaintiff's treatment was anything other than an observation related to the dates Plaintiff sought treatment.

Additionally, as can be seen, the ALJ evaluated the medical opinions of Dr. Shawberry and Ms. Rewa, and Dr. Vaught and Ms. La Vasque with specific references to the evidence in the record, articulated the weight assigned to each opinion, and explained the rationale for assigning that weight. *Id.* Contrary to Plaintiff's assertion, the ALJ's explanation was neither "brief" nor "cursory"; the ALJ properly considered and gave good reasons for the weight accorded to the opinions of Dr. Shawberry and Ms. Rewa, and Dr. Vaught and Ms. La Vasque. Also contrary to Plaintiff's assertion, the ALJ explained how the evidence of record fails to support and contradicts the limitations opined by Dr. Shawberry and Ms. Rewa, and did not merely discount their opinion because they "must be overly sympathetic to the Plaintiff." *Id.* Further contrary to Plaintiff's assertion, the ALJ additionally addressed the Appeals Council's concerns regarding her evaluation of the opinion of Dr. Vaught and Ms. La Vasque, explicitly explaining why she accorded their opinion only some weight. *Id.* The ALJ in the instant action followed the directions of the Appeals Council and properly evaluated the mental health medical opinions; Plaintiff's contentions on this point fail.

## 2. Plaintiff's Credibility and Subjective Complaints

Plaintiff contends that in finding that his subjective complaints were not fully credible, the ALJ improperly relied on his instances of physical exercise, when "Plaintiff alleges only mental impairments." Docket No. 13, p. 11.

27

Defendant responds that the ALJ appropriately assessed Plaintiff's credibility using the required factors and "properly determined that Plaintiff's allegations regarding his limitations were not totally credible" as they were "inconsistent with the record as a whole, including the medical evidence, his medical treatment, his daily activities, and the medical opinions." Docket No. 14, p. 4-5, *citing* TR 24-36. Specifically, Defendant argues that although Plaintiff "alleged disabling mental impairments," the medical evidence demonstrated, *inter alia*, that he "received medication and therapy with good results"; that "he appeared alert, oriented, and pleasant with good eye contact, normal speech, organized and logical thought process, intact memory, normal attention and concentration, and appropriate judgment and insight"; that he was "repeatedly described as cooperative"; and that he had "no difficulty interacting" with a state agency employee. *Id.* at 4-6 (citations omitted).

Defendant further argues that the ALJ appropriately noted that "[t]esting suggested he was exaggerating the severity of his symptoms," and that the ALJ properly identified other inconsistencies between Plaintiff's allegations and the evidence of record, including, *inter alia*, Plaintiff's daily activities, completion of an Associate's Degree, ability to work for two years after his alleged disability onset date and actually supervise other employees during that time, ability to maintain a relationship with his fiancé and care for his son, and drug use, such that the ALJ did not err in discounting Plaintiff's credibility. *Id.* at 6-9 (citations omitted).

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective allegations:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability . . . . There must be evidence of an underlying medical condition *and* (1) there must be

> objective medical evidence to confirm the severity of the alleged
> pain arising from the condition *or* (2) the objectively determined
> medical condition must be of a severity which can reasonably be
> expected to give rise to the alleged pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986), *quoting* S.

Rep. No. 466, 98th Cong., 2d Sess. 24 (emphasis added); *see also* 20 CFR §§ 404.1529, 416.929

("statements about your pain or other symptoms will not alone establish that you are disabled . . .

."); *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 (6th Cir. 1990) ("though Moon alleges fully

disabling and debilitating symptomatology, the ALJ may distrust a claimant's allegations . . . if

the subjective allegations, the ALJ's personal observations, and the objective medical evidence

contradict each other.").  Moreover, "[a]llegations of pain . . . do not constitute a disability,

unless the pain is of such a debilitating degree that it prevents an individual from participating in

substantial gainful employment." *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224,

1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider

the following factors and how they relate to the medical and other evidence in the record: the

claimant's daily activities; the location, duration, frequency, and intensity of claimant's pain; the

precipitating and aggravating factors; the type, dosage, and effect of medication; and the other

treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994)*,*

*construing* 20 CFR § 404.1529(c)(2).  After evaluating these factors in conjunction with the

evidence in the record, and by making personal observations of the claimant at the hearing, an

ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms

are not credible. *See, e.g., Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997);

*Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981).

The ALJ in the case at bar ultimately found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." TR 34. The ALJ explained her rationale for so finding as follows:

> The claimant does appear to have anxiety and somatoform issues. Although he repeatedly reported frequent panic attacks, his records fail to provide conclusive proof that he was actually having true panic attacks as frequently as he states he was having them, and his statements about the frequency and severity of his statements are questionable in light of evidence in his treatment records that he sometimes gave overly dramatic reports of his symptoms, by his own admissions to VBHCS staff. Further, although he had multiple emergency room visits in the first few years of the relevant period for nausea, vomiting, diarrhea, or chest pain, these did not occur so frequently as to pose a significant impediment to full-time work activity, and have not occurred frequently in the past few years. His records show that he had some improvement with therapy. His treatment does not appear to have been optimal, with gaps in his therapy treatment, and a lack of any substantial effort to get him properly medicated. He also submitted minimal evidence concerning the first two years of the relevant period, which has a negative impact on the credibility of his allegations. His self-reported anger and periodical violent and homicidal ideation might be a concerning factor as to his employability. However, it is apparent that he only very infrequently acted on his ideations, with isolated incidents of assaults or other dangerous behavior. He was mostly able to control himself when he had these thoughts and he repeatedly denied any intent or specific targets over the past few years. He made progress with coping mechanisms including mediation [*sic*], self-talking, and other skills used to manage his panic and anger symptoms. It is apparent that he could manage these issues sufficiently that while work with the public is clearly not advisable, some contact with co-workers and

supervisors is not unreasonable.

> The claimant's activities strongly suggest that he is not as limited as he alleges. Although he attempted to downplay or deny such activities at the hearings, his records and statements show that he went to school during the relevant period, ran regularly, held an advanced skill level in karate, worked, cared for pets, cared for his son every other weekend, lived alone during parts of the relevant period, drove alone, cleaned and worked around his home his home [*sic*], shopped, had a large circle of friends or acquaintances, had a fiancé, helped his grandparents, went to the movies, and was involved with a church and bible study (Exs. 5E; 10F at 1; 20F; 22F). These activities substantially diminish his credibility. His credibility is also diminished by the fact that, despite his assertions to the contrary, his records reveal that he continued to use marijuana over several portions of the relevant period, despite reporting that it increased his anxiety. Additionally, the undersigned notes that the claimant tried to claim he was unable to complete his classes due to difficulty performing mathematics, and he claimed he failed them, but the record actually shows that he passed three of his classes and at one point he admitted that he worked 50 hours straight on his schoolwork (*See* Exs. 36F; 37F; *particularly* Exs. 36F at 16 and 37F at 5, 14).

TR 34-35, *citing* TR 325-32, 609, 691-724, 726-800, 1188-1216, 1217-77.

As can be seen, the ALJ's decision specifically addresses not only the medical evidence, but also Plaintiff's testimony and his subjective claims, clearly indicating that these factors were considered. TR 27-36. Contrary to Plaintiff's assertion, the record reflects that the ALJ did not base her credibility determination on Plaintiff's instances of physical exercise, but rather, appropriately noted Plaintiff's activities when recounting the evidence that undermined his credibility. *See* TR 34-35. The ALJ's articulated rationale demonstrates that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on evidence that was inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective

medical evidence against Plaintiff's subjective claims and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; *Kirk,* 667 F.2d at 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531, *citing Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531, *citing Bradley,* 862 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 921 (6th Cir. 1987). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record. S*ee King*, 742 F.2d at 975.

As discussed above, after assessing all of the medical and testimonial evidence, the ALJ ultimately determined that Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were not entirely credible. TR 34. In making this determination, the ALJ observed Plaintiff during his hearing, assessed the medical records, reached a reasoned decision, and articulated the basis for that decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

### 3. Hypothetical Question and Reliance on the VE's Testimony Related Thereto

Plaintiff argues that the ALJ's hypothetical question posed to the VE did not accurately reflect his mental limitations, and therefore that the ALJ erred in relying upon the VE's testimony

to establish the existence of a significant number of jobs in the national economy that Plaintiff could perform. Docket No. 13, p. 16. Specifically, Plaintiff argues that the Appeals Council directed the ALJ "to formulate the Plaintiff's mental limitations in the terms required by Social Security Ruling 96-8p: specifically, in functional terms such as constantly, frequently, occasionally or none," stating that "[t]he Appeals Council noted that the terms used in the ALJ's previous hypothetical to the VE were too vague and did not provide specific functional limitations." *Id.* Plaintiff argues that the question posed by the ALJ at the second hearing differed from that posed at the first hearing only slightly, with the term "work only related contact" with co-workers being substituted for the term used previously, "limited contact" with co-workers. *Id.* Plaintiff objects to this term because "[t]heoretically, any contact with co-workers in a work setting would be 'work only related'" and it "still does not describe in functional terms what the limitation might actually be and the extent of the contact that the ALJ hypothesized would be permitted the theoretical claimant." *Id.* Plaintiff maintains that "it is impossible to determine" whether some of the jobs that the ALJ found Plaintiff can perform correspond with the level of co-worker contact that is possible for Plaintiff "based on the hypothetical question due to its lack of specificity." *Id.* at 16-17. Plaintiff further maintains that "[t]he re-phrased hypothetical also fails to conform to the remand order from the Appeals Council." *Id.* at 17.

Defendant responds that, "[a]lthough the hypothetical question must set forth with reasonable precision the claimant's impairments, it need only include those impairments and limitations found credible by the ALJ." Docket No. 14, p. 13 (citations omitted). Defendant maintains that "the ALJ incorporated the credible limitations in the RFC and corresponding

hypothetical question," and thus that the VE appropriately testified in response to a hypothetical question that incorporated the same limitations as the RFC. *Id.* at 13-14. Defendant asserts that the ALJ's decision is therefore supported by substantial evidence. *Id.*

Regarding Plaintiff's argument that the term "work only related contact" is ambiguous, Defendant responds that:

> [t]he limitation is very clear that Plaintiff could have work-related contact with supervisors and co-workers. It is worth noting that the ALJ explained that the limitation addressed the Appeals Council issue regarding the previous ambiguous RFC. Plaintiff's representative had no issues with the hypothetical question at the administrative hearing.

*Id.* at 14 (citations omitted).

As explained above, the Commissioner has the burden at step five of the sequential evaluation process of establishing the claimant's ability to work by proving the existence of a significant number of jobs in the national economy that the claimant could perform, given his or her age, experience, education, and residual functional capacity. 20 CFR §§ 404.1520, 416.920. *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The Commissioner's burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not significantly limited by nonexertional impairments, such as mental limitations, manipulative limitations, or environmental limitations. *Abbot v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

In the presence of nonexertional limitations that would preclude the application of the grid, "expert testimony would be required to satisfy the Secretary's burden of proof regarding the availability of jobs which this particular claimant can exertionally handle." *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 531 (6th Cir. 1983). In other words, the ALJ may rely on

the testimony of a VE in response to a hypothetical question as substantial evidence of the existence of a significant number of jobs that the claimant is capable of performing as long as the hypothetical question accurately represents the claimant's credible limitations. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d at 779, *quoting O'Banner v. Sec'y of Health, Ed. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978).

The ALJ in the instant action posed the following hypothetical question to the VE:

Q.      All right. Good. Thank you. All right. So then, Ms. Neel, let me present you a hypothetical. This is what the Appeals Council asked me to clarify. So let's assume an individual who has the claimant's age, which you don't know. His date of birth is July 5th of 1980. He does have some college classes under his belt. And then we've just talked about the past work so let's assume a hypothetical person who has the claimant's age, educational background and work experience. For my first hypothetical there are no exertional limitations, but this person is restricted to unskilled work, consisting of both simple and complex tasks and instructions, but no executive level task or instructions. This person can attend to and complete such tasks and instructions for periods of at least two hours at one time. This person should perform no work around the general public, but can handle work only related to contact with coworkers and supervisors. This person can respond appropriately to hazards in the workplace and can adapt to gradual changes in the workplace routine. So Ms. Neel, given these limitations I just gave you, are there any, or can the past work be performed, I should ask first.

A.      Judge, the laborer would be available.

Q.      That would be the landscape laborer?

A.      Yes, Judge.

                            . . .

Q.      And that would rule out the other jobs?

35

A.      Yes, Judge.

                                . . .

Q.      So since we – he did do the landscaping laboring work, but
        he didn't do it at SGA levels.  Ms. Neel, are there other
        jobs that could be found in the economy that could be
        allowed under these limitations?

A.      Yes, Judge.  There would be some medium work such as a
        floor cleaner, <u>DOT</u> 381.687-034.  There would be
        approximately 29,000 in Tennessee; 1,600,000 in the U.S.
        There would be some packer jobs, <u>DOT</u> 920.587-018, and
        it has an SVP: 2 again.  It would be approximately 1,000 in
        Tennessee and 42,000 in the U.S.  There would be some
        jobs such as a cook helper, <u>DOT</u> 317.687-010.  It has a
        SVP: 2.  There would be approximately 700 in Tennessee
        and 251,000 in the U.S.

Q.      Okay.  So the floor cleaner is an SVP: 2?

A.      Yes, Judge.

Q.      Okay.  Thank you.  And Ms. Neel, is your testimony
        consistent with the <u>DOT</u>?

A.      Yes, Judge.

TR 62-63.

        As can be seen, the ALJ posed a hypothetical question to the VE that incorporated those

of Plaintiff's limitations found to be credible by the ALJ.  *See* TR 24-25.[4]  An ALJ may rely on

the testimony of a VE in response to a hypothetical question as substantial evidence of the

─────────────────

        [4] Plaintiff's counsel also presented hypothetical questions to the VE.  *See* TR 64-66.  The
hypothetical questions presented by Plaintiff's counsel to the VE incorporated the limitations
Plaintiff alleged, not those accepted as credible by the ALJ.  *Compare* TR 24-25 *with* TR 64-66.
Thus, the ALJ was not bound to accept the VE's answers to the hypothetical questions posed by
Plaintiff's counsel, and those answers, in and of themselves, do not constitute substantial
evidence that establish grounds for reversal or remand.

                                36

existence of a significant number of jobs that the claimant is capable of performing as long as the hypothetical question accurately represents the claimant's credible limitations. *See Varley*, 820 F.2d at 779, *quoting O'Banner v. Sec'y of Health, Ed. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978).

In the instant action, the hypothetical question posed to the VE by the ALJ, upon which the ALJ relied to establish the existence of a significant number of jobs in the national economy that Plaintiff could perform, accurately reflected the limitations that the ALJ found credible, consistent with, and supported by, the evidence of record. *See* TR 24-25, 62-63. Because the hypothetical question upon which the ALJ ultimately rendered her decision accurately represented Plaintiff's credible limitations, the ALJ properly relied on the VE's answer to that hypothetical question to prove the existence of a significant number of jobs in the national economy that Plaintiff could perform. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987); *Varley*, 820 F.2d at 779. Accordingly, Plaintiff's claim fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any

response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); FED. R. CIV. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge